## LICENSE AGREEMENT

BENIHANA NATIONAL CORP.,

Licensor,

- to -

BENIHANA OF TOKYO, INC.,

Licensee.

May /5, 1995

40863.1

EXHIBIT

2

## LICENSE AGREEMENT

**LICENSE AGREEMENT** made and entered into as of this _____ day of May, 1995 by and between **BENIHANA NATIONAL CORP.**, a Delaware corporation, having its principal office at 8685 N.W. 53rd Terrace, Miami, Florida 33166 ("Licensor") and **BENIHANA OF TOKYO, INC.**, a New York corporation, having its principal office at 8685 N.W. 53rd Terrace, Miami, Florida 33166 ("Licensee").

## W I T N E S S E T H:

WHEREAS, Licensor has created and developed a unique and distinctive system of high-quality restaurants known as "Benihana of Tokyo" (the "System"); and

WHEREAS, Licensor is the sole and exclusive owner of all proprietary and other property rights and interests in and to certain trade names, service marks, trade marks, logos, emblems and indicia of origin, including but not limited to the marks "Benihana", "Benihana of Tokyo" and the "flower" symbol, and such other trade names, service marks and trade marks as Licensor may develop in the future for the purpose of identifying the System (the "Marks"); and

WHEREAS, Licensor continues to develop, use and control the use of such Marks in order to identify for the public the source of services and products marketed thereunder and under the System and to represent the System's high standards of quality, appearance and service; and

WHEREAS, Licensee understands and acknowledges the importance of Licensor's high standards of quality, cleanliness, appearance and service and the necessity of operating the

40863.1

business franchised hereunder in conformity with Licensor's standards and specifications; and

WHEREAS, Licensee desires to use the System and acquire a license to use the Marks in connection with the operation of restaurants in accordance with the terms and provisions of this Agreement.

WHEREAS, Licensor and Licensee have entered into this Agreement in consideration of the transfer by Licensee to Licensor of certain assets of Licensee pursuant to that certain Agreement and Plan of Reorganization dated as of December 29, 1994, and amended as of March 17, 1995 by and among Licensee, Benihana National Corp., Licensor and BNC Merger Corp.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1.

### GRANT OF LICENSE

1.1  Licensor hereby grants to Licensee, subject to the terms and conditions herein contained, the right, license and franchise to establish and operate Benihana of Tokyo restaurants (collectively, the "Restaurants" and individually, a "Restaurant"), in the State of Hawaii outside the 15-mile radius around the Benihana of Tokyo restaurant presently located in Kaanapali-Lahaina, Maui, Hawaii (the "Territory"), pursuant to that certain License Agreement dated March 16, 1988 between Benihana National Corp., as licensor, and Chiyoda & Associates,

40863.1

as licensee, and to use solely in connection therewith the System, including the Marks as they may be changed, improved and further developed from time to time, in accordance with the terms and conditions of this Agreement.  All references contained herein to "Benihana of Tokyo Restaurant" shall be deemed to refer to "Benihana restaurant" and vice versa.

1.2  The grant of this license does not imply the grant of rights to any other Territory.

1.3  During the term of this Agreement, provided that Licensee is in substantial compliance with the terms and conditions of this Agreement, Licensor shall not establish or license anyone other than Licensee to establish a Restaurant utilizing the System or the Marks at any location within the Territory.

## ARTICLE 2.

### CONSTRUCTION OF THE RESTAURANTS

2.1  Licensor shall inspect the Restaurants and approve in writing the design, fittings, fixtures, furnishings and equipment of or in the Restaurants and confirm in writing that the Restaurants are in compliance with the System.

2.2  Any and all subsequent improvements to the Restaurants shall be constructed or caused to be constructed by Licensee, and all fixtures, furnishings and equipment utilized in or at the Restaurants shall be purchased by Licensee, at its sole cost and expense, in accordance with design development and structural drawings, construction plans, and general plans, specifications and designs (collectively "Plans") approved in

- 3 -

writing by Licensor, such approval not to be unreasonably withheld.

2.3  Licensee shall be solely responsible for obtaining all licenses, permits and clearances and otherwise complying with all local zoning and other applicable laws, ordinances, rules and regulations, whether federal, state or local, in connection with the construction and operation of the Restaurant.

### ARTICLE 3.

### FEES AND REPORTS

3.1  The grant of this license and the rights to use the Marks is royalty-free to Licensee.

3.2  (a)  In the event Licensee assigns or sublicenses any of its rights under this Agreement to a transferee that is not affiliated with Licensee, then such transferee shall assume all of Licensee's obligations under the terms of this Agreement and pay to Licensor monthly royalties (the "Royalties") equal to 6% of Gross Sales (as defined herein).  As used in this Agreement, "affiliate" of Licensee shall mean a person or entity that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the Licensee, or any entity in which Rocky H. Aoki or any affiliate is the beneficial owner of fifty percent (50%) or more of the voting equity or fifty percent (50%) or more of the equity or profit sharing interest, whether voting or non-voting.

(b)  As used in this Agreement, "Gross Sales" shall mean the entire amount of the actual sales price, whether for cash or otherwise, of all sales of food, beverages, merchandise and services in, on or from the Restaurant, including

40863.1

any sales relating to catering or Hotel services (whether or not invoiced separately from other Hotel charges or services), receipts from mail or telephone orders received at or filled from the Restaurant, all deposits not refunded to purchasers, orders taken at the Restaurant, although such orders may be filled elsewhere, and payments to transferee by any concessionaire, franchisee or person otherwise in the Restaurant with Licensor approval.  Gross Sales shall not include: (i) the amount of returns to shippers or manufacturers; (ii) the amount of any cash or credit refunds made upon any sale where the merchandise sold or some part thereof is thereafter returned by the purchaser and accepted by transferee; (iii) receipts from sales of furniture, trade fixtures or other extraordinary sales not made in the ordinary course of business; (iv) sums collected and paid out for any sales or value added tax which is required by and collected on its behalf by transferee directly from transferee's customers and paid by transferee to the taxing authority; (v) Restaurant employee meals which are incident to employment; (vi) gratuities and any service charge in lieu of gratuities, provided the same are actually paid over to the employees of the Restaurant.  Each charge or sale upon installment or credit shall be treated as a sale for the full price in the fiscal period during which such charge or sale shall be made, irrespective of whether, or of the time when, transferee shall receive payment (whether full or partial) thereof.

   (c)   Transferee shall keep accurate books of accounts and records with respect to Gross Sales and shall retain such books and records for at least three (3) years from the end

40863.1

of the transferee's fiscal year during which such sales occur or, if an audit is in progress or a controversy should arise between the parties hereto regarding the Royalties during such three (3) year period, until such audit or controversy is terminated. All books and records relating to Gross Sales shall be maintained at the Restaurant or at transferee's main offices.

(d)   On or before the twentieth (20th) day of each month during the term hereof, transferee shall remit the Royalties for the preceding month together with delivery to Licensor of a written statement of Gross Sales for such month and cumulative for the calendar year. Royalties shall be paid in United States Dollars. Such statement shall be certified as accurate by a financial officer of transferee or by transferee's chief accountant responsible for overseeing the relevant books and records.

(e)   Licensor or its representative authorized in writing at all reasonable times shall have the right to audit or examine and make copies of the accounting books and records of transferee as the same may reasonably relate to the Restaurant or to this Agreement. If transferee shall have furnished a statement as required by Section 3.2 and as a result of an audit or review by Licensor the determination of the aggregate Gross Sales for any month shall be incorrect in transferee's favor by more than three percent (3%) or if the transferee shall have failed to furnish any statement when required, transferee shall pay the cost of any such audit or examination. In all other events, Licensor shall pay the cost of such audit or examination. In addition to the reports required herein, transferee shall

40863.1

furnish such other reports relating to the operation of the Restaurant as Licensor from time to time may reasonably request.

(f)   Any payment due hereunder not received by Licensor on the due date thereof shall bear interest at the rate of prime plus one and one-quarter percent (1.25%) (calculated on a daily basis based upon a 360-day year) charged by First Union National Bank of Florida, N.A. on the first business day of the calendar month during which such payment was originally due or on the first business day of any calendar month during which such payment remains outstanding, whichever is higher, from the due date to the date of payment thereof, but in no event in excess of the maximum rate chargeable under applicable usury laws.

(g)   Transferee agrees to use cash registers at the Restaurant with sealed continuous totals.

3.3   Licensee shall keep accurate books of account and records with respect to the business transacted by it pursuant to this Agreement and shall maintain the same at the Restaurant or at Licensee's main offices.   Licensor, or its representative authorized in writing, at all reasonable times shall have the right to audit or examine and make copies of the accounting books and records that reasonably relate to the Restaurant or to this Agreement.

3.4   The parties recognize that, subject to Section 3.2, this is a royalty-free license, but the obligation of Licensee to provide reports and information and rights of inspection contained in this Agreement are granted by Licensee to Licensor in recognition of the fact that such information will

40863.1

assist Licensor in determining compliance with the terms of this Agreement.

## ARTICLE 4.

### SERVICES TO BE RENDERED BY LICENSOR

4.1  Licensor shall make available to Licensee, on a consulting basis, employees of Licensor who are experienced in the construction, design, planning, installation and renovation of Benihana of Tokyo restaurants.  The provision of such services shall be subject to Licensor's prior business commitments and shall be provided entirely at Licensee's cost and expense, to be agreed upon before providing such services.  Such services shall be rendered at the Licensor's offices in Miami, Florida (or other offices designated by Licensor).  Should any such services be required away from such offices and should Licensor consent to render such services, Licensee shall be obligated to pay, in addition to the amount referred to above, all reasonable travel, lodging and living and other expenses agreed in advance and incurred by the personnel rendering such services.  Nothing contained in this section shall be interpreted to require Licensor or its employees to act as construction managers or to actually supervise the design, construction or renovation of Licensee's Restaurant.

4.2  Licensor will assist Licensee in finding equipment and suitable chefs and managers for the Restaurants.  Although Licensor will use its best efforts in finding such chefs and managers, whenever requested by Licensee, this shall not be interpreted as requiring Licensor to find any such personnel or

40863.1

as a representation that any such personnel will, in fact, be found.

4.3   Licensor will provide training for chefs, managers and other restaurant personnel.  Such training shall be entirely at Licensee's cost and expense, to be agreed before providing such training.  Such training shall be similar to that provided to Licensor's personnel.

4.4   Licensor shall provide consulting services to the Licensee in connection with the operation of the Restaurants.  Such consulting services shall be entirely at Licensee's cost and expense, to be agreed upon before providing such consulting services.

### ARTICLE 5.

### SERVICE MARKS AND TRADE<br>NAMES; CONFIDENTIAL INFORMATION

5.1   Licensor represents and warrants that it is the owner of all right, title and interest in and to the Marks and the goodwill associated within symbolized by them, and that it has the right and authority to enter into this Agreement.

5.2   Licensee acknowledges that it has simultaneously herewith transferred all of its right, title and interest in and to the Marks in the Territory to Licensor and disclaims any right or interest therein or to the goodwill derived therefrom, and further acknowledges that Licensor has the sole right (subject to this Agreement and any other licenses it may have granted) to use such Marks.  Licensee will use such Marks only in the manner and to the extent specifically permitted in this Agreement.  All use by Licensee of the Marks shall inure to the benefit of Licensor.

- 9 -

Licensee shall appropriately indicate the ownership of the Marks whenever they are used by Licensee. Any and all advertising, publicity, signs, decorations, furnishings, equipment or other matter employing in any way whatsoever the words "Benihana", "Benihana of Tokyo" or the "flower" symbol shall be submitted to Licensor for its approval prior to publication or use. Licensor shall not unreasonably withhold approval for any such publication or use.

5.3   Licensee shall not in any way do anything to infringe upon, harm or contest the rights of Licensor in the Marks or in any other symbols, logos, marks or names which incorporate the Marks.

5.4   In the event Licensee learns of any claim or infringement of any of the Marks or any claim of unfair competition or other challenge to Licensee's right to use any Marks, Licensee shall immediately notify Licensor. Licensor shall have the sole and exclusive right, in its sole discretion, at its own cost and expense and for its own use and benefit, to institute suit or take such other action as it may deem proper to restrain any such infringement and defend any other such claim. In the event Licensor determined not to restrain any such infringement or not to commence or thereafter not to prosecute any suit, Licensee shall not have the right to commence any such proceeding. Licensee shall have the right to defend any such proceeding brought against it if, and only to the extent, such claim is for money damages against Licensee and not to the extent that such suit relates to the Marks. Each of the parties hereto shall be entitled to be represented in any proceeding relating to

40863.1

the matters covered by this Section in which the other party is involved, at its own cost and expense. Each party hereto shall fully cooperate with the other in any such proceeding, provided that it is reimbursed for its actual costs and expenses for doing so, not including counsel fees, if any.

5.5  Licensee covenants and agrees not to contest, directly or indirectly, Licensor's rights or interest in and to (including, without limitation, the right to license to others) the Marks, trade secrets, methods, procedure and advertising techniques which are part of Licensor's business or System. Licensee acknowledges that the recipes, products, proprietary formulations, technology, know-how and operation of Benihana of Tokyo restaurants are derived from information disclosed by Licensor to Licensee and that such information is proprietary and confidential and constitutes a trade secret of Licensor. Licensee shall take all action necessary to, and shall, at all times, treat all such confidential information as confidential, divulging the same only to such of its employees as must have access to such confidential information in order to properly operate the Restaurants licensed hereunder. Upon termination hereof for any reason whatsoever all of Licensee's rights to use such information shall cease.

## ARTICLE 6.

### COMPLIANCE WITH SYSTEM

6.1  Licensee understands and acknowledges that benefits to both parties will be derived from uniformity of quality and appearance among all licensees and franchisees which

40863.1

can be accomplished more effectively, in most cases, by the use

of standardized equipment, tables, fixtures, food, beverages,

dishes, mugs and supplies in the Restaurants (collectively

"Material") which may or may not be purchased from common sources

of supply.  Therefore, Licensee shall purchase Material for which

there is approved or designated sources of supply, from its

designated or approved suppliers; Licensee shall purchase all .

other Material as complies with the specifications from time to

time promulgated by Licensor regarding such Material.  If

Licensee wishes to purchase Material either from persons other

than designated or approved suppliers or which does not conform

to then existing specifications, Licensor shall review Licensee's

proposed source of supply or change of specifications and advise

Licensee whether or not such other source of supply or such

changed specifications are acceptable to it in its sole

discretion.  Any and all costs and expenses incurred by Licensor

in reviewing, analyzing and considering such changed source of

supply or specifications shall be paid by Licensee.

    6.2  Licensee agrees to diligently operate the

Restaurants in strict compliance with the procedure, System and

method of operation disclosed by Licensor pursuant to this

Agreement including, without limitation, menu selection, food

preparation and method of service, and further agrees to abide by

all reasonable recommendations of Licensor relating to, and

changes in, said procedure, System and method of operation.

    6.3  Licensee shall sell or offer for sale only such

products and services as have been expressly approved for sale in

writing by Licensor (such approval shall not be unreasonably

- 12 -

40863.1

withheld) and prepared in accordance with Licensor's then current specifications, and shall refrain from any material deviations from Licensor's standards and specifications without Licensor's prior written consent which may be withheld in Licensor's sole discretion.

6.4  Licensee, or its approved designee, shall be required to participate, at Licensee's sole cost and expense, in operational conferences or seminars, conducted by Licensor from time to time, in order to ensure continued compliance with procedure and method of operation.  Irrespective of the aforementioned, Licensee shall be obligated to attend at least one operational conference or seminar in each twelve (12) month period.

## ARTICLE 7.

### ADVERTISING

7.1  Licensee shall use all reasonable efforts to promote and advertise the Restaurants and the System.  Such advertising may consist of: television, radio, magazine or newspaper advertising; direct mail; billboard advertising; promotional brochures and literature; point-of-sale advertising materials (including, without limitation, materials available to Hotel guests); etc.  In addition to the foregoing, Licensee, at its cost and expense, shall obtain listings in bold type in the white and yellow pages of all local telephone directories covering the area in which the Restaurants are located, under the name "Benihana restaurant" or "Benihana of Tokyo Restaurant".

- 13 -

40863.1

7.2  All advertising and promotion by Licensee in any medium shall be conducted in a dignified manner and shall conform to the standards and requirements that Licensor may reasonably establish from time to time.  Licensee shall be obligated to expend annually not less than two percent (2%) of Gross Sales on local advertising.

## ARTICLE 8.

### COVENANTS OF LICENSEE

8.1  Licensee covenants and agrees as follows:

(a)  To diligently operate the Restaurants on days and during hours as other first class restaurants in the general area of the Restaurants are operated, except when it may be impracticable to do so due to circumstances beyond Licensee's control.

(b)  To maintain a high moral standard and atmosphere at the Restaurants; to properly and in a sanitary manner prepare all food and beverages and to serve the same in a wholesome, appetizing and efficient manner; to maintain the Restaurants in a clean, safe and orderly manner; to provide efficient, courteous and high quality service to the public, to the end that the Restaurants shall help to create and build goodwill among the public for the System as a whole, and so that Licensor, Licensee and each member of the System shall be benefitted, and the public assured uniform, efficient, courteous, high quality service on a standardized basis.

(c)  To advertise, sell or offer for sale only those items which are sold by Licensor in its company-owned

- 14 -

40863.1

restaurants or such other products as are approved by Licensor in writing, which shall not be unreasonably withheld, prior to offering the same for sale.

(d)  To indemnify and hold harmless Licensor, its officers, agents and employees from any loss, cost, damage, expense and liability, including reasonable attorneys' fees and court costs, by reason of damage or loss, including personal injury, of whatsoever nature or kind, arising in connection with or by reason of:  (i) any negligent act or failure to act on the part of Licensee, its agents, servants, and/or employees' or (ii) any other reason so long as such loss, cost, damage, expense or liability resulted from the license herein granted, and was not the fault of Licensor to any material degree.

(e)  To carry throughout the term of this Agreement on the Restaurants, and to keep in force by advance payment of premium in responsible insurance companies lawfully entitled to do business in the State of Hawaii:

(i)  Comprehensive general public liability insurance with a combined single limit of liability of $5,000,000, which insurance shall include products liability coverage and auto liability coverage for owned and hired vehicles.  Such insurance shall name the Licensor as an additional assured and shall insure the contractual liability of the Licensee under the preceding paragraph (d) of this Section.

(ii)  Fire insurance with an extended coverage endorsement on all furniture, fixtures and equipment equal in amount to the actual cash value thereof.

(iii)  Workmen's compensation insurance in at least statutory amounts.

(iv)  Plate glass insurance on all plate glass, if any, in the Restaurants.

40863.1

All such policies to be carried by Licensee shall be endorsed so as to require the insurance company to give at least thirty (30) days written notice by registered or certified mail to Licensor before changing or cancelling any such policy, and a certificate of such insurance issued by the insurance companies shall be furnished to Licensor.  If Licensee fails to obtain such insurance, Licensor shall have the right, but not the obligation, to purchase such insurance and, if Licensor does so, then Licensee shall promptly pay Licensor upon demand the reasonable cost thereof.

(f)  To cause its officers or partners, as the case may be, to be personally responsible, where required by law, in all respects for the employment, control and conduct of any and all persons hired or employed by Licensee in the discharge of its duties hereunder; without limiting the generality of the foregoing, Licensee shall, at its own cost and expense, comply with all unemployment insurance, old-age pensions and other social security acts applicable to employers and/or employees, and whether now in force, or hereafter enacted and shall pay, duly and punctually, any and all rates, taxes, assessments and contributions that may be required or be demanded under, or by virtue of, any of the said statutes.

(g)  Not to carry on or conduct or permit others to carry on or conduct any other business activity or operation from the Restaurants' premises other than the operation of the licensed business.  Without limiting the foregoing, Licensee shall not permit any vending machines in or at the Restaurants' premises or grant to any third party any concession or license to

- 16 -

operate at the Restaurants, without the prior written consent of Licensor in each instance.

    (h)  To promptly pay any and all personal property taxes, sales tax, or any other tax that may be imposed, levied or assessed against Licensee by any federal, state, county or municipal authority; provided that Licensee shall have the right to contest the amounts of such tax and/or the means of assessment thereof.

    (i)  To operate and maintain the Restaurants in strict compliance with all applicable laws, ordinances, regulations and other requirements of all federal, state, county, municipal and other governmental or quasi-governmental authorities in force for the operation of the Restaurants.

    (j)  That it will not, during the term of this Agreement, solicit for employment any person who is at the time of such solicitation, employed by Licensor or any of its licensees, nor will Licensee directly or indirectly induce or attempt to induce any such person to leave his or her employment as aforesaid.

    8.2  The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Article 8 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in a final decision to which Licensor is a party, Licensee expressly agrees to be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as

40863.1

if the resulting covenant was separately stated in and made a part of this Article 8.

8.3  Licensee expressly agrees that the existence of any claim which it may have against Licensor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Licensor of the covenants in this Article 8.

8.4  Licensee acknowledges and agrees that any failure to comply with the covenants and agreements in this Article 8, or with the covenants and agreements in Article 5 hereof with respect to the Marks and to confidential information, shall constitute a material event of default under this Agreement, and that a violation of the requirements of this Article 8 or of such requirements of Article 5 would result in irreparable injury to Licensor for which no adequate remedy at law may be available, and, therefore, Licensor shall be entitled, in addition to any other remedies which it may have hereunder, at law or in equity, to obtain specific performance of, or an injunction against the violation of, the requirements of this Article 8 and such requirements of Article 5, without the necessity of showing actual or threatened damage.

8.5  Licensee agrees to pay all costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Licensor in connection with the enforcement of this Article 8 or of Article 5 provided that the Licensee is determined to be the breaching party.

40869.1

## ARTICLE 9.

### INSPECTIONS

9.1  Licensor, or its authorized representatives, shall have the right to enter and inspect the Restaurants and examine and test food products and supplies from time to time for the purpose of ascertaining that the Restaurants are operated in accordance with the standards set forth herein.  Inspections shall be conducted during normal business hours.  Licensor shall notify Licensee of any deficiencies detected during inspection and Licensee shall diligently correct any such deficiencies. Upon reasonable notification by Licensor that any Material does not meet the specifications, standards and requirements of Licensor, Licensee shall desist or refrain from further use thereof.

## ARTICLE 10.

### ASSIGNMENT

10.1  The Licensor and Licensee, subject to Section 3.2, shall each have the right to assign their respective rights under this Agreement to any person, firm, association or corporation provided that such transferees shall agree in writing to assume all obligations undertaken herein by the Licensor or Licensee, as the case may be.  Upon such assignment and assumption, the Licensor or Licensee, as the case may be, shall be under no further obligation hereunder, except for liabilities accrued to the date of such assignment or transfer, if any.  Such assignment shall not be binding upon the Licensor or Licensee, as the case may be, unless the transferee has agreed in writing to

40863.1

assume all of the assignor's obligations under the terms of this Agreement, and the other party has received a statement in writing signed by both the assignor and its transferee of the assumption of such obligations. Notwithstanding anything to the contrary contained herein, any assignment or sublicense by Licensee shall require the prior written consent of Licensor, which shall not be unreasonably withheld.

## ARTICLE 11.

### INDEMNIFICATION

11.1   Licensee agrees, during and after the term of this Agreement, to indemnify, defend and hold harmless Licensor and its affiliates and such parties' stockholders, officers and directors, from and against any and all claims, demands, proceedings, suits, losses, damages and liabilities arising directly or indirectly from, as a result of, or in connection with the construction, operation, condition, use or occupancy of the Restaurants. Licensor shall have the right independently to take any action it may deem necessary, in its sole discretion, to protect or defend itself and the persons and entities indemnified against any threatened action subject to indemnification hereunder, without regard to the expense, forum or other parties that may be involved. Licensor shall have sole and exclusive control over the defense of any such action, and over the settlement, compromise or other disposition thereof, as well as the right to be represented by counsel of its own choosing. Licensee's obligations hereunder shall include the cost of defense of Licensor as well as the payment of any settlement

40863.1

approved by Licensee or any final judgment which may be rendered against Licensor or any reasonable settlement agreed to by Licensor.  At the request of Licensor, Licensee shall enter into a separate indemnification agreement based on the foregoing terms directly with any of the persons or entities indemnified hereunder.

## ARTICLE 12.

### DEFAULT; TERMINATION

12.1  The occurrence of any of the following events shall constitute good cause for Licensor, at its option and without prejudice to any other rights or remedies provided for hereunder or by law or equity, to terminate this Agreement:

(a)  If a non-affiliated transferee of Licensee defaults in the payment of Royalties or any other monies due and payable to Licensor for ten (10) days after such monies are due and payable;

(b)  If Licensee shall be adjudicated a bankrupt, becomes insolvent, or if a receiver or custodian (permanent or temporary) of its property or any part thereof is appointed by a court of competent authority; if it makes a general assignment for the benefit of creditors, or if a final judgment remains unsatisfied of record for thirty (30) days or longer (unless a supersedeas bond is filed) or if  execution is levied against Licensee's business or property, or a suit to foreclose any lien or mortgage against a Restaurant or Material is instituted against Licensee and not dismissed within thirty (30) days;

- 21 -

(c)   If Licensee defaults in the performance of any term, condition or obligation of payment of any indebtedness to Licensee's suppliers or others arising out of the purchase of supplies or purchase or lease of equipment for operation of its Restaurant(s), and if any such default is not cured within thirty (30) days after written notice by Licensor to Licensee;

(d)   If Licensee fails to maintain the standards as set forth in this Agreement as to cleanliness, health and sanitation, and compliance with the procedure, system and method of operation (including, without limitation, quality and quantity of food products served), and said failure or default shall continue for thirty (30) days after notification;

(e)   If Licensee commits or suffers a violation of any law, ordinance, rule or regulation of a governmental agency in connection with the operation of a Restaurant and permits the same to go uncorrected for thirty (30) days after notification thereof, unless there is a bona fide dispute as to the violation or legality of such law, ordinance, rule or regulation and Licensee promptly resorts to courts or forums of appropriate jurisdiction to contest such violation or legality;

(f)   If Licensee ceases to operate a Restaurant (whether directly or through sublicense or assignment) and such failure continues for a period of at least five (5) years.

(g)   If Licensee violates any other substantial term or condition of this Agreement and Licensee fails to cure such violation within thirty (30) days after written notice from Licensor to cure same;

40863.1

(h)  If Licensor gives (i) three (3) notices of any default hereunder (and such defaults are thereafter cured), within any consecutive twelve (12) month period; (ii) five (5) such notices during any consecutive twenty-four (24) month period; or, (iii) ten (10) such notices during the term hereof;

(i)  If each officer, director and shareholder or partner, as the case may be, does not within thirty (30) days of becoming such, agree in writing to be bound by the provisions of Article 8 hereof.

12.2  Anytime after the occurrence of any of the events specified in Section 12.1, Licensor may terminate this Agreement by giving Licensee written notice of such termination.  Such notice shall specify a date, not less than ten (10) days after the date of such notice on which date this Agreement shall terminate.

12.3  Licensee may terminate this Agreement by giving Licensor written notice of such termination and, if Royalties are required to be paid to Licensor, the payment of a Termination Fee (as herein defined), as provided below.  Such notice shall specify a date not less than ninety (90) nor more than one hundred twenty (120) days from the date of such notice on which date this Agreement shall terminate.  The Termination Fee shall be equal to the average of the annual Royalties paid to Licensor during the last three (3) year period prior to termination.

12.4 (a)  Upon termination of this Agreement for any reason, Licensee's right to use in any manner the marks "Benihana", "Benihana of Tokyo", or the "flower" symbol or any other mark registered by Licensor (or insignia or slogan used in

40863.1

connection therewith), or any confusingly similar trademark, service mark, trade names or insignia shall terminate forthwith. Licensee shall not thereafter directly or indirectly identify itself in any manner as a Benihana of Tokyo franchisee or publicly identify itself as a former Benihana of Tokyo franchisee or use any of Licensor's trade secrets, signs, symbols, devices, recipes, formulas or other materials constituting part the system.  Such termination, however, shall not affect the obligations of the Licensor to take action or abstain from taking action after the termination hereof as provided elsewhere in this Agreement.

(b)  Upon the termination of this Agreement for any reason, the Licensee shall immediately discontinue the use of all service marks, trade names, signs, structures, and forms of advertising indicative of Benihana of Tokyo, its symbols, service marks or its business or products; and, so far as the Licensee may lawfully do so, shall make or cause to be made such removals of or changes in signs, buildings and structures as the Licensor shall reasonably direct so as to eliminate the names "Benihana" or "Benihana of Tokyo" and the "flower" symbol from the Restaurants and to effectively distinguish the Restaurants from their former appearance and from any other Benihana restaurant. If the Licensee shall, upon request, fail or omit to make or cause such changes to be made, then the Licensor shall have the right to enter upon the Licensee's Restaurants, and without prejudice to the Licensor's other rights and remedies and have the right to make or cause to be made such changes at the Licensee's expense.

40863.1

(c)   In the event of termination for any default of Licensee, the extent of all damage which Licensor has suffered by virtue of such default shall be and remain a lien in favor of Licensor against any and all of the personal property, machinery, fixtures and equipment owned by Licensee at the Restaurants at the time of such default.   From time to time, upon the request of Licensor, Licensee shall execute, deliver and/or file all financing statements and other documents requested by Licensor to evidence and/or perfect such lien.

## ARTICLE 13.

## ARBITRATION

13.1   If this Agreement shall be terminated by Licensor and Licensee shall dispute Licensor's right of termination, or the reasonableness thereof, the dispute shall be settled by arbitration at the main office of the American Arbitration Association in the City of New York in accordance with the rules of said association and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof.   The arbitration panel shall consist of three (3) members, one (1) of whom shall be chosen by Licensor, and (1) by Licensee and the other by the two (2) so chosen.

13.2   In the event that any other dispute arises between the parties hereto in connection with the terms or provisions of this Agreement, either party by written notice to the other party may elect to submit the dispute to binding arbitration in accordance with the foregoing procedure.   Such right shall not be exclusive of any other rights which a party

40863.1

may have to pursue a course of legal action in an appropriate forum.  Enforcement of any arbitration award, decision or order may be sought in any court having competent jurisdiction.


## ARTICLE 14.

### RELATIONSHIP BETWEEN PARTIES

14.1   This Agreement does not in any way create the relationship of partners or of principal and agent between Licensor and Licensee and in no circumstances shall Licensee be considered the agent of Licensor.  Licensee shall not act or attempt to act or represent itself, directly or by implication, by reason of the rights granted hereby, as agent of Licensor or in any manner assume or create or attempt to assume or create any obligation or make any contract, agreement, representation or warranty on behalf or in the name of Licensor, nor shall Licensee act or represent itself as an affiliate of any other authorized Benihana of Tokyo franchisee by reason of the rights granted hereby.


## ARTICLE 15.

### TERM

15.1   This Agreement shall continue in perpetuity unless terminated as provided herein.


## ARTICLE 16.

### RIGHT OF FIRST REFUSAL

- 26 -

16.1   If during the term of this Agreement, Licensee proposes to sell, assign or sublicense its rights under this Agreement to, or enter into a joint venture with, a non-affiliated transferee with respect to a Restaurant, Licensee shall deliver to Licensor a copy of each proposed agreement for each Restaurant to be transferred.  Licensor shall have forty-five (45) days from the receipt of such proposed agreement to notify Licensee that it desires to accept the proposed agreement, and concurrently with such notice shall deliver to Licensee any initial contract deposit payable by the transferee under the proposed agreement.  Upon receipt of such notice and payment from Licensor, Licensee shall enter into the proposed agreement with Licensor as transferee thereunder.  If Licensor does not express its intent to enter into the proposed agreement, and the proposed agreement is not entered into by Licensee with the contemplated third party, Licensee shall be obligated to resubmit to Licensor any subsequent modification to the proposed agreement or any subsequent proposed agreement.

## ARTICLE 17.

### MISCELLANEOUS

17.1   The privileges herein granted to Licensee contemplate the establishment and operation of Restaurants in the Territory designated herein, and the rights herein granted shall not be applied or extended, directly or indirectly, to any other business or enterprise or Territory without the express consent in writing of Licensor.

40863.1

17.2 This Agreement, contains the entire agreement of the parties with respect to the subject matter hereof and no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein shall be of any force or effect. No failure of Licensor to exercise any power given it hereunder or to insist upon strict compliance by Licensee of any obligation hereunder, and no custom or practice of the parties at variance with the terms hereof shall constitute a waiver of Licensor's right to demand exact compliance with the terms hereof. Waiver by Licensor of any particular default by Licensee shall not affect or impair Licensor's rights in respect to any subsequent default of the same or of a different nature, nor shall any default or omission of Licensor to exercise any rights arising from such defaults affect or impair Licensor's rights as to such default or any subsequent default.

17.3 Neither Licensor nor Licensee shall be liable to perform any of its obligations under this Agreement if such failure to perform is due to strikes, lockouts, stoppages, accidents, transportation delays, war, government regulations or act of God or other causes beyond the reasonable control of Licensor or Licensee and the happening of any such cause of delays shall extend the time of performance by the time occasioned by any such cause of delay.

17.4 If any covenant or other provision of this Agreement is invalid, or incapable of being enforced, by reason of any rule of law or public policy, all other conditions and provisions of this Agreement shall, nevertheless, remain in full force and effect, and no covenant or provision shall be deemed

40863.1

dependent upon any other covenant or provision unless so expressed herein.

17.5   Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against which enforcement of the change, waiver, discharge or termination is sought.

17.6   All notices required or permitted to be given hereunder shall be in writing, sent by certified or registered mail, return receipt requested, or by Express Mail, Federal Express or equivalent overnight delivery service, as follows: if to Licensor, addressed to it at the address set forth at the head of this Agreement, with a copy to Dornbush Mensch Mandelstam & Schaeffer, 747 Third Avenue, New York City, New York 10017, Attention:  Darwin C. Dornbush, Esq.; and if to Licensee, addressed to it at the address set forth at the head of this Agreement.  Either party may change its address for receipt of notices, from time to time, by written notice to the other as set forth herein.  Notices shall be deemed given when delivered or when first refused (as evidenced by the receipt or delivery records of the delivery agent).

17.7   This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be performed solely within such jurisdiction.

17.8   This Agreement shall be binding upon and inure to the benefit of the parties and their permitted successors and assigns.

40863.1

17.9   This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but such counterparts together shall constitute but one and the same instrument.

17.10   All terms and words used in this Agreement, regardless of the number of gender in which they are used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context or sense of this Agreement or any paragraph or clause herein may require, as if such words had been fully and properly written in the appropriate number and gender.

17.11   The various titles of the Articles herein are used solely for convenience and shall not be used for interpreting or constructing any word, clause, paragraph or section of this Agreement.

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the day and year first above-written.

ATTEST:                                    BENIHANA NATIONAL CORP.

By: _____                By: _____
         (Seal)                                        President

ATTEST:                                    BENIHANA OF TOKYO, INC.

By: _____                By: _____
         (Seal)                                 Executive Vice President

- 30 -

40863.1

# STEARNS WEAVER MILLER
# WEISSLER ALHADEFF & SITTERSON, P.A.

Alan H. Fein
150 West Flagler Street, Suite 2200
Miami, FL 33130
Direct: (305) 789-3416
Fax: (305) 789-2617
Email: afein@stearnsweaver.com

July 30, 2013

**Via FedEx**

Benihana of Tokyo, Inc.
c/o James D. Burdett, Esq.
Barnes & Thornburg LLP
1717 Pennsylvania Avenue, N.W.
Suite 500
Washington, DC 20006-4623

Dear Jim:

We write again, on behalf of Benihana, Inc., to insist on your client's strict compliance with the License Agreement, dated May 15, 1995, and to provide notice under that Agreement.[1]

As you know, the License Agreement begins with the parties' acknowledgment that the Licensor, Benihana, Inc., "has created a unique and distinctive system of high quality restaurants known as 'Benihana of Tokyo' ("the System")." The Licensee, Benihana of Tokyo, Inc. ("BOT"), then acknowledged "the importance of Licensor's high standards of quality, cleanliness, appearance and services and the necessity of operating the business franchised hereunder in conformity with Licensor's standards and specifications." In Section 6.2 of the License Agreement, BOT agrees to diligently operate the restaurants in *strict compliance* with "the System" and other procedures.

The parties to this agreement chose their words carefully to underscore the value of the brand and the necessity for strict compliance with regard to the limited license granted your client in most of the State of Hawaii.

It has become increasingly apparent that BOT does not take its obligations seriously. On March 14, 2011, Janet Gamble wrote to you and Richard Feldman to formally request specific information to allow Benihana to determine whether BOT was indeed diligently operating its

---

[1] The License Agreement provides that notice to BOT should be given "at the address set forth at the head of the Agreement." That address is 8685 NW 53rd Terrace, Miami, Florida 33166. Because that is no longer BOT's address, and BOT has not designated a new address under the License Agreement, we are sending this to you, with a copy to BOT at the last known address.

Benihana of Tokyo, Inc.
c/o James D. Burdett
July 30, 2013
Page 2

Hawaii restaurant in strict compliance with the System and related requirements.  That request was ignored.

On October 22, 2012, Ms. Aoki emailed Cristina Mendoza and stated that "I would never agree to have Benihana of Tokyo be subject to the standards of Benihana, Inc."  She went on to say that "I am told by my attorneys that due to Benihana, Inc.'s failure to supervise the operations in Hawaii for decades, that any rights it may have had would be lost in any event."

As an aside, I'm fairly certain you have not offered that bizarre advice to your client.  In fact, as you likely know, Benihana, Inc. indeed supervised the Hawaii operations during the term of the Agreement, and has tried to continue to do so.  Moreover, Section 17.2 of the License Agreement makes it clear that no past failure to insist upon strict compliance "shall constitute a waiver of Licensor's right to demand *exact* compliance with the terms hereof."

BOT's actions since her October, 2012 communication makes it clear that BOT has no intention of being in strict compliance with the System or the other critical terms of the License.  Earlier this year, Benihana learned of BOT's decision to add "Beni Burgers" to its menu, in violation of the License Agreement.  Our letter to you dated May 6, 2013 on this subject (and again requesting compliance with the March, 2011 letter) has been ignored, and we have since learned that BOT has exacerbated the violation by selling "Beni Burgers" from unauthorized outdoor carts bearing Benihana's marks.  These are additional examples of BOT's contempt for the "strict compliance" and "exact compliance" provisions of the License Agreement.

The purpose of this letter is to put BOT on notice that it is in violation of substantial terms of the License Agreement.  The requests contained in our letters of May 14, 2011 and May 6, 2013 have been ignored, and it is apparent that BOT is not operating the Hawaii restaurant in strict compliance with the System and other parameters set forth in the License Agreement.

Under Section 12.1(g) of the License Agreement, BOT has thirty (30) days to cure the violations of the agreement, and to come into strict compliance with the System and the Agreement's attendant requirements.  Should BOT fail to fully cure within this period, Licensor will aggressively pursue all remedies, including its right to terminate under Section 12.2 of the License Agreement.

Sincerely,

Alan H. Fein

cc:    Cristina Mendoza, Esq.
       Benihana of Tokyo, Inc. (via FedEx)

# STEARNS WEAVER MILLER
# WEISSLER ALHADEFF & SITTERSON, P.A.

Janet Moreira Gamble
150 West Flagler Street, Suite 2200
Miami, FL 33130
Direct: (305) 789-4170
Fax: (305) 789-2612
Email: jgamble@stearnsweaver.com

March 14, 2011

By E-mail
Joseph D. Lewis, Esq.  (joe.lewis@btlaw.com)
James R. Burdett, Esq. (jim.burdett@btlaw.com)
Barnes & Thornburg LLP
750 17th Street N.W.
Suite 900
Washington, D.C. 20006
Fax: (202) 289-1330

Richard B. Feldman, Esq. (rfeldman@rfs-law.com)
Rosenberg Feldman Smith LLP
551 Fifth Avenue
24th Floor
New York, NY 10176
Fax: (212) 867-9045

Re:     *Benihana of Tokyo, Inc.*
        Our File No. 33076-0012

Dear Sirs:

        We write with regard to several matters requiring your client, Benihana of Tokyo, Inc.'s
("BOT") immediate attention.

1.  Panama

        Further to our previous correspondence, we continue to await BOT's cooperation and
signature to certain documents for purposes of recording the assignment of Panama Registration
Nos. 45025-02 and 45024-02 to our client.   The May 15, 1995 Assignment of Trademarks
requires BOT to:

        perform all such further actions and [to] execute, acknowledge and deliver all
        further assignments, transfers, consents, and other documents as Assignee, or its
        counsel, may reasonably request to vest more fully in Assignee, and perfect
        Assignee's rights to and interest in, and enjoyment of the Trademark.

MIAMI  •  FORT LAUDERDALE  •  TAMPA  •  TALLAHASSEE

Mssrs. Lewis, Burdett, and Feldman
Barnes & Thornburg, LLP
Rosenberg Feldman Smith LLP
March 14, 2011
Page 2

In your e-mail of February 9, 2011, you advised us that you were waiting for Mr. Michael Kata's return to the United States in order to discuss this issue with him. We have not heard from you since. Please advise us when we can expect to receive the executed and notarized Affidavit of Current Address enclosed herewith so that we may proceed with perfecting our client's ownership in these registrations.

2.   Venezuela

In addition, we have learned that BOT's pending application to register BENIHANA, subject of Application No. 1993-7750, is precluding the use and registration of our client's own pending application in Venezuela. Please take immediate steps to abandon BOT's application to register the BENIHANA mark in Venezuela and provide us with confirmation of same.

3.   Potential Infringements

As joint owners of the BENIHANA® brand, our respective clients have a vested interest in being proactive and policing the relevant markets for infringers. With the global economy and the overabundance of media outlets reaching audiences worldwide, it is more important than ever to keep watch over the BENIHANA® brand in order to prevent weakening of its distinctiveness and reputation.

We have previously notified you of several potential infringements including: (i) a restaurant operation in Montreal, Canada (www.benihanamontreal.com; (ii) a pending trademark application in China to register the mark BENIHANA TEPPANYAKI & Design for restaurant services; and (iii) the domain name registration of www.benihanakuwait.com. Please advise us as to the status of BOT's investigation into these matters and whether BOT has taken any action to address these third party unauthorized uses of the BENIHANA® mark.

In addition, we have learned of the following additional potential infringements:

- Benihana-japan.com: The domain name www.benihana-japan.com has been registered to an individual in Japan and appears to direct to a website with adult content.

- Benihana-systems.net: The domain name www.benihana-systems.net has been registered to a business in Japan. This website is inactive and it does not currently appear to offer any goods/services.

- Benihananet.com: The domain name www.benihananet.com has been registered to a business in Japan. This website does not currently appear to offer any goods/services.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Mssrs. Lewis, Burdett, and Feldman
Barnes & Thornburg, LLP
Rosenberg Feldman Smith LLP
March 14, 2011
Page 3

- Benny Hana.  This appears to be a restaurant operation located at: Olympic Village, 5666 Rue Sherbrooke East, Montreal, Quebec, Canada QC H1N.

Please keep us closely advised of your investigation and actions with respect to these newly-identified infringements.

Our client is particularly concerned with third party uses in geographic areas adjacent to the territory where Benihana, Inc. operates, including, without limitation, those third party uses in Canada.  If there is a lack of vigilant enforcement of the BENIHANA® trademarks, there is a risk that the strength of the marks will be diluted in those countries where Benihana, Inc. owns trademark rights and operates, reducing the value and strength of the BENIHANA® trademarks to our client.  We anticipate that your client takes these matters as seriously as we do and we look forward to your report on these items.

4.  Hawaii

Finally, in our client's effort to ensure that its licensees and franchisees are in compliance with the restricted use of the BENIHANA® trademarks and the BENIHANA® system, we write to formally request your cooperation in providing us with certain materials and information for our client's inspection and review in connection with the May 15, 1995 License Agreement between our respective clients:

- Examples of all current advertising, publicity, signs, decorations, furnishings, equipment, or other matter employing in any manner whatsoever the trademarks BENIHANA, BENIHANA OF TOKYO, or the Flower Design mark.  According to Article 5.1, any such materials shall be submitted to Benihana for its approval prior to publication or use.

- A copy of the restaurant menu identifying menu items currently being offered at BOT's Hawaii operation.  Article 6.2 requires BOT to diligently operate the Hawaii restaurant in strict compliance with the procedure, System, and method of operation disclosed by Benihana including without limitation menu selection. Article 6.3 requires that BOT only sell or offer for sale such products/services expressly approved for sale in writing by Benihana.

- Information relating to the methods and media through which BOT advertises the Hawaii operation along with annual advertising expenditures for the last five (5) years of operation.  Article 7.1 requires BOT to use reasonable efforts to promote and advertise the Hawaii restaurant and BENIHANA system.  Article 7.2 requires BOT to expend no less than 2% of its Gross Sales, as defined in Article 3.2(b), on local advertising on an annual basis.

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

Mssrs. Lewis, Burdett, and Feldman
Barnes & Thornburg, LLP
Rosenberg Feldman Smith LLP
March 14, 2011
Page 4

- ▪ Photographs of the interior of the restaurant. Article 2.2 requires that any and all improvements to the restaurant shall be in compliance with the Plans, as that term is defined therein, and approved by Benihana.

- ▪ A list of suppliers being used for equipment, tables, fixtures, food items, mugs and various other restaurant supplies. Article 6.1 requires BOT to purchase such materials from designated or approved suppliers.

- ▪ Copies of the accounting books and records relating to the last five (5) years of operation. Article 3.3 provides that Benihana shall have the right to audit or examine and make copies of the accounting books and records that reasonably relate to the restaurant or to the license agreement.

Please feel free to contact me should you have any questions regarding any of the above. Be advised, however, that this letter and any negotiations regarding same constitute a confidential offer to compromise a claim and, therefore, may not be introduced in any subsequent proceeding for any reason under applicable state, federal and common law.

We look forward to hearing from you.

Sincerely,

Janet Moreira Gamble, Esq.

cc:    Benihana, Inc.
       Alan Fein, Esq.
       Robert W. Whetzel, Esq.

#768066 v1

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.

FILED: NEW YORK COUNTY CLERK 09/23/2013

NYSCEF DOC. NO.
Case 1:10-cv-01051-UNA   Document 1   Filed 12/03/10   Page 1 of 13 PageID #: 1
INDEX NO. 158697/2013
Case 1:13-cv-06766-PAE   Document 1-1   Filed 09/24/13   Page 38 of 50
RECEIVED NYSCEF: 09/23/2013

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| BENIHANA OF TOKYO, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   CIVIL ACTION NO: |
| | ) |
| BENIHANA INC., | ) |
| | ) |
| and | ) |
| | ) |
| NOODLE TIME, INC., | ) |
| | ) |
| Defendants. | ) |

### <u>COMPLAINT</u>

Plaintiff BENIHANA OF TOKYO, INC. hereby alleges as follows:

1.      Plaintiff Benihana of Tokyo, Inc. (hereinafter referred to as "BOT") is a corporation organized and existing under the laws of the State of New York, having its principal place of business at 645 Fifth Avenue, New York, NY 10022.

2.      Plaintiff is informed and believes and based thereon alleges that Defendant Benihana Inc. (hereinafter referred to as "BI") is a Delaware corporation with a principal place of business at 8685 Northwest 53rd Terrace, Miami, Florida 33166.

3.      Plaintiff is informed and believes and based thereon alleges that Defendant Noodle Time, Inc. (hereinafter referred to as "Noodle Time") is a Florida corporation with a principal place of business at 8685 NW 53rd Terrace Miami, Florida 33166.  Noodle Time is a subsidiary of BI.

**JURISDICTION**

4.      Jurisdiction over this action is founded upon 28 U.S.C. § 1331, 1332 and 1338 because the Complaint raises a federal question, the Complaint asserts a cause of action under the federal Trademark Act, and because the Plaintiff and Defendants are citizens of different states.   There is complete diversity between the Plaintiff and Defendants.   The amount in controversy is in excess of $75,000.00.

5.      Venue in this district is proper pursuant to 28 U.S.C. § 1391.

**FACTUAL BACKGROUND**

6.      BOT was founded by Rocky Aoki in 1963.   It owns and operates Benihana restaurants in certain territories outside the continental United States and owns intellectual property interests in the Benihana name, trademark and service mark, including but not limited to BENIHANA (hereinafter the "BENIHANA Trademark"), and other intellectual property used in the operation of Benihana restaurants.

7.      Upon information and belief, BI owns and operates or franchises several restaurants which are located inside the continental United States, in Central America, South America and in the islands of the Caribbean Sea, and which operate under the BENIHANA Trademark.   Upon information and belief, said restaurants are licensed by Noodle Time to use the BENIHANA Trademark.

8.      BOT and BI are parties to a contract titled "Amended and Restated Agreement and Plan of Reorganization," which was dated as of December 29, 1994 and amended as of March 17, 1995 (hereinafter referred to as the "ARA").

9.      The ARA sets forth terms and conditions of a business relationship between BOT

and BI, including with regard to the BENIHANA Trademark.

10.     The ARA in Subsection 1.01(d) defines "Territory" as "the United States (including its territories and possessions), Central America, South America and the islands of the Caribbean Sea."

11.     The ARA provides in Section 7.10:

> **Section 7.10 Trademarks**. Each of BOT and Benihana acknowledge that, from and after the Effective Time, Benihana will own the Trademarks in the Territory and BOT will continue to own the Trademarks outside of the Territory. Accordingly, each of BOT and Benihana agree that, without the prior written consent of the other, neither will make any use of the Trademarks which could reasonably be expected to reduce the value or usefulness of the Trademarks to the other party. In addition, each of BOT and Benihana shall be responsible for the proper registration and maintenance of the Trademarks and the prosecution of infringements or potential infringements of the Trademarks in the territories where such party has an interest in the Trademarks. Each of BOT and Benihana agrees to notify the other promptly of any infringement or potential infringement of the Trademarks of which such party becomes aware and to cooperate with the other party in any action taken to prosecute any such infringement. The obligations of this Section shall survive the Closing for an indefinite period.

12.     The ARA provides that BOT will own the BENIHANA Trademark outside of the defined Territory.

13.     The ARA prohibits BI from making any use of the BENIHANA Trademark which could reasonably be expected to reduce the value of said BENIHANA Trademark to BOT, without BOT's consent.

14.     The ARA further provides that the filing of applications to register the BENIHANA Trademark in the geographic territory outside of the United States, Central America, South America and the islands of the Caribbean Sea is a right reserved to BOT.

15.     Upon information and belief, on or about April 23, 2010, BI, through its

subsidiary Noodle Time, initiated with the World Intellectual Property Organization (hereinafter "WIPO"), an application for international registration of the BENIHANA Trademark. Said application was assigned by WIPO International Registration No. 1048205.

16. The application filed with WIPO seeks to register the BENIHANA Trademark in the name of "Noodle Time Inc." in several countries outside of the United States, Central America, South America and the islands of the Caribbean Sea, including Iceland, Iran, Monaco, Singapore, Ukraine, Vietnam and Zambia.

17. In applying with WIPO for registration of the BENIHANA Trademark in these countries, Defendants falsely asserted to be acting on behalf of "Benihana of Tokyo, Inc."

18. In applying with WIPO for registration of the BENIHANA Trademark in Iceland, Iran, Monaco, Singapore, Ukraine, Vietnam and Zambia, Defendants falsely suggested and asserted that it is was the owner of the BENIHANA Trademark in these countries.

19. The application filed with WIPO was filed without the consent of BOT.

20. Section 1.01 of the ARA further provides:

> Section 1.01 The Transfer. Subject to the terms and conditions hereof at the Effective Time (as defined in Section 2.02), BOT agrees to sell, transfer and assign to Benihana (or to a wholly-owned subsidiary of Benihana designated by Benihana), all of BOT's right, title and interest in and to all assets (the "Assets") of BOT specifically related to the Restaurants (as hereinafter defined), including, without limitation, the following:
>
> (a) all chattels, fixtures, equipment and other personal property (the "Chattels") owned by BOT and used in the operation of each of the "Benihana of Tokyo" restaurants listed on Schedule A hereto (the "Restaurants");
>
> (b) all leasehold interests or other interests in real property owned or used by BOT in respect of the Restaurants;

(c) all liquor licenses and other permits and licenses used in the operation of the Restaurants which are transferable in accordance with applicable laws and regulations;

(d) each of the trademarks and servicemarks (the "Trademarks") listed on Schedule 1.01(d) to the extent applicable to the United States (including its territories and possessions), Central America, South America and the islands of the Caribbean Sea (the "Territory"), including all goodwill related thereto;

(e) cash and accounts receivable related to the Restaurants;

(f) the inventory of closed packages of food and beverages located at the Restaurants or centrally stored or on order for the Restaurants, subject to compliance with all applicable laws and regulations; and

(g) each of the license agreements set forth on Schedule 1.01(g) hereto and all rights related thereto.

Subject only to the representations and warranties of BOT contained herein, the Assets are to be assigned by BOT and acquired by Benihana on an "as is" basis as of the Effective Time. The business conducted by BOT through the Restaurants is hereinafter referred to as the "Business."

21.     The term "Assets" as used in Section 1.01 of the ARA does not include intellectual property other than the Trademarks as defined in the ARA and listed on Schedule 1.01(d) thereto.

22.     A purported "Assignment of Trademarks," dated May 15, 1995 (hereinafter "1995 Assignment") and signed by Taka Yoshimoto, who was identified as an Executive Vice President of BOT, which purported to assign specified trademarks and service marks was recorded in the United States Patent and Trademark Office (hereinafter "USPTO") on June 21,1995.

23.     Upon information and belief, Mr. Yoshimoto was not empowered to sign that 1995 Assignment, because he was not an Executive Vice President of BOT and was at the same

time an agent of BI.

24.     A purported "United States Assignment," dated July 31, 1998 (hereinafter "1998 Assignment") and signed by Joel A. Schwartz, who was identified as President of Benihana National Corp., which purported to assign specified trademarks and service marks was recorded in the USPTO on August 24, 1998.

25.     Upon information and belief, Mr. Schwartz executed the 1998 Assignment under the direction of Darwin Dornbush (hereinafter "Dornbush").

26.     Upon information and belief, at the time that the ARA was negotiated and executed, Dornbush was an attorney for, and owed a duty of loyalty to, Rocky Aoki and BOT.

27.     Upon information and belief, and unbeknownst to BOT and Rocky Aoki, Dornbush has acted with an impermissible conflict of interest with respect to matters relating to BOT, including its assets and its control.

## FIRST CAUSE OF ACTION
## (BREACH OF CONTRACT)

28.     Plaintiff refers to and realleges Paragraphs 1 through 27 above as though fully set forth at this point.

29.     Defendants have breached the ARA by using the BENIHANA Trademark and claiming ownership thereof in geographic territories reserved exclusively to BOT, including Iceland, Iran, Monaco, Singapore, Ukraine, Vietnam and Zambia.

30.     The aforesaid acts of Defendants have reduced the value and usefulness to BOT of the BENIHANA Trademark in breach of the ARA.

31.     As a direct result of the breach of contract by Defendants, BOT has been damaged

and continues to be damaged in an amount not yet fully ascertainable but that will be determined at trial.

## SECOND CAUSE OF ACTION
## (SPECIFIC PERFORMANCE)

32.     Plaintiff refers to and realleges Paragraphs 1 through 27 above as though fully set forth at this point.

33.     Defendants have breached the ARA by seeking to register BENIHANA as its exclusive mark in countries of Iceland, Iran, Monaco, Singapore, Ukraine, Vietnam and Zambia in breach of the contractual prohibition against doing so.

34.     The ARA provides in Section 10.10 that irreparable damage would occur in the event that the provisions of the ARA are not performed in accordance with its terms, and that the parties shall be entitled to specific performance of the terms of the ARA in addition to any other remedy at law or equity.

35.     Upon information and belief, unless or until this court grants an order for specific performance requiring Defendants to assign and return to BOT the trademark rights in Iceland, Iran, Monaco, Singapore, Ukraine, Vietnam and Zambia, Defendants will continue to assert ownership thereof.

## THIRD CAUSE OF ACTION
## (CONVERSION)

36.     Plaintiff refers to and realleges Paragraphs 1 through 27 above as though fully set forth at this point.

37.     Upon information and belief, Defendants have converted to their ownership title to the BENIHANA Trademark in at least the countries of Iceland, Iran, Monaco, Singapore,

Ukraine, Vietnam and Zambia and thereby threatened use of the BENIHANA Trademark in their own name.

38.     Unless or until this court grants an order requiring Defendants to return these trademark rights to BOT, Plaintiff is informed and believes and based thereon alleges that Defendants will not return said trademark rights.

## FOURTH CAUSE OF ACTION
## (FALSE DESIGNATION OF ORIGIN)

39.     Plaintiff refers to and realleges Paragraphs 1 through 27 above as though fully set forth at this point.

40.     In seeking to register the BENIHANA Trademark in the countries of Iceland, Iran, Monaco, Singapore, Ukraine, Vietnam and Zambia, BI has falsely claimed to be acting on behalf of "Benihana of Tokyo, Inc."

41.     "Benihana of Tokyo, Inc." is a corporate and trade name owned exclusively by BOT.

42.     Use by BI of the corporate and trade name "Benihana of Tokyo, Inc." falsely suggests that Defendants are acting with the authorization of BOT, and that the applications for registration of the BENIHANA Trademark in the countries of Iceland, Monaco, Singapore, Ukraine, Vietnam and Zambia were made on behalf of BOT, or with the consent of BOT.

43.     The assertion by Defendants of ownership of the BENIHANA Trademark in the counties of Iceland, Iran, Monaco, Singapore, Ukraine, Vietnam and Zambia is a false claim of ownership and a false designation of origin in violation of 15 U.S.C. § 1125(a).

44.     In marketing its services, Defendants advertise that they have "Locations

throughout the United States, Latin America and the Caribbean."

45.     Defendants' advertising falsely suggests that Defendants have the right to operate BENIHANA restaurants throughout Latin America.

46.     Rights in the mark BENIHANA in Mexico are reserved exclusively to BOT because Mexico is located in North America.  BOT is owner of Mexico trademark registration No. 888138 for the BENIHANA Trademark for restaurant services.

47.     Mexico is considered to be part of the geographic area known as Latin America. Therefore, Defendants do not have rights to utilize the BENIHANA Trademark throughout Latin America.

48.     Defendants' aforesaid statements constitute false designations in violation of 15 U.S. C. § 1125(a).

49.     Upon information and belief, the false designations made by Defendants were willful and intentional.

50.     As a direct result of the false designations by Defendants, BOT has been damaged and continues to be damaged in an amount not yet fully ascertainable but that will be determined at trial.

**FIFTH CAUSE OF ACTION**
**(TRADEMARK INFRINGEMENT)**

51.     Plaintiff refers to and realleges Paragraphs 1 through 27 above as though fully set forth at this point.

52.     This is a claim for trademark infringement over which this court has supplemental or pendant jurisdiction, and which is related to the aforesaid causes of action.

53.     BOT is the owner of Singapore Trademark No. 8858/91which confers on BOT the exclusive right to the BENIHANA Trademark for restaurant services in Singapore.   This trademark registration is in full force and effect.

54.     BOT is the owner of Vietnam Trademark No. 23577 which confers on BOT the exclusive right to the BENIHANA Trademark in Vietnam.   This trademark registration is in full force and effect.

55.     Upon information and belief, Defendants applied to register the BENIHANA Trademark in Singapore and Vietnam for restaurant services and have thereby threatened use of BOT's registered marks in Singapore and Vietnam, which constitutes trademark infringement under the national laws of Singapore and Vietnam.

56.     Defendants are well aware of BOT's trademark rights and agreed by way of the ARA contract not to use BOT's trademarks outside of the United States, Central America, South America and the islands of the Caribbean Sea without the consent of BOT.

57.     Upon information and belief, Defendants will infringe BOT's registered trademark to the irreparable injury of BOT to which BOT has no adequate remedy of law unless Defendants are enjoined by this court from doing so.

58.     Defendants' infringing conduct has caused and is causing substantial and irreparable injury and damage to BOT in an amount not capable of calculation, and unless restrained, will cause further irreparable injury leaving BOT with no adequate remedy at law. Accordingly, BOT respectfully requests the court issue a preliminary and permanent injunction against Defendants' continued actions to seek ownership and use of the BENIHANA Trademark outside of the United States, Central America, South America and the islands of the Caribbean

Sea.

59.     Upon information and belief, Defendants have knowingly and willfully engaged in the acts complained of with malice, and in conscious disregard of the rights of BOT.  BOT is therefore entitled to the maximum damages allowable by law.

### SIXTH CAUSE OF ACTION
### (DECLARATORY JUDGMENT)

60.     Plaintiff refers to and realleges Paragraphs 1 through 27 above as though fully set forth at this point.

61.     The parties have differing beliefs as to the meaning of the word "Assets" as used in Section 1.01 of the ARA.

62.     BOT's belief is that the transferred Assets include intellectual property only to the extent that they constitute trademarks and service marks listed on Schedule 1.01(d) of the ARA, to the extent applicable to the defined Territory.

WHEREFORE, Plaintiff BOT prays as follows:

1.     That Plaintiff BOT be awarded compensatory damages in the amount to be determined according to proof at trial for Defendants' breach of contract, false designations of origin and infringement of trade name and trademark rights;

2.     For a judgment declaring that BOT is the exclusive owner of trademark rights in the BENIHANA Trademark outside of the United States, Central America, South America and the islands of the Caribbean Sea;

3.     For a judgment declaring that BOT is the exclusive owner of the trade name "Benihana of Tokyo, Inc.";

4.     For a judgment declaring that the only intellectual property transferred by the

ARA was the trademarks and service marks listed on Schedule 1.01(d) of the ARA, to the extent applicable to the defined Territory, and the goodwill associated therewith;

5.    That Defendants' be jointly and severally adjudicated to have infringed BOT's Trademark Registrations in Singapore and Vietnam.

6.    That Defendants be enjoined and restrained during the pendency of this action and permanently thereafter from using or registering the BENIHANA Trademark outside of the United States, Central America, South America and the islands of the Caribbean Sea;

7.    That Defendants be enjoined and restrained during the pendency of this action and permanently thereafter from using the trade name or corporate name "Benihana of Tokyo, Inc.";

8.    That Defendants be enjoined and restrained during the pendency of this action and permanently thereafter from claiming that they are operating or have the right to operate locations throughout Latin America;

9.    That the court order Defendants to account to Plaintiff for all gains profits, and advantages derived by their false designations of origin and their mis-use and infringement of BOT's trademark rights;

10.    For an award of reasonable costs, expenses and attorneys fees; and

11.    For further relief as the court may deem just and proper.

/s/ Mark R. Owens
David M. Powlen (DE No. 4978)
BARNES & THORNBURG LLP
1000 North West Street, Suite 1200
Wilmington, Delaware 19801
Telephone (302) 888-4536
Electronic Mail:  david.powlen@btlaw.com


Mark R. Owens (DE No. 4364)
BARNES & THORNBURG LLP
11 S. Meridian Street
Indianapolis, IN 46204
Telephone (317) 236-1313
Facsimile (317) 231-7433

1000 North West Street, Suite 1200
Wilmington, Delaware 19801
Telephone (302) 888-4536
Electronic Mail:  mark.owens@btlaw.com


James R. Burdett, Esq.
Joseph D. Lewis, Esq.
*Motions for admission pro hac vice pending*
BARNES & THORNBURG, LLP
750 17th Street, NW, Suite 900
Washington, D.C. 20006
Telephone (202) 289-1313
Facsimile   (202)289)-1330
Electronic Mail: jim.burdett@btlaw.com

*Attorneys for Benihana of Tokyo, Inc.*

DCDS01 148673v1

- 13 -